UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KATHY M. TAYLOR, FRED O. TAYLOR, MARGIE M. DUNBAR, and CHRYSTAL M. STETLER, both individually and as guardian ad litem of the minor children, K.S., B.S. and E.S., <br><br> Plaintiffs, <br><br> v. <br><br> INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, CITY OF INDIANAPOLIS, POLICE CHIEF MICHAEL T. SPEARS, both individually and in his capacity as Chief of Police, and CANINE OFFICER M. RAND, ID#R8233, both individually and in his official capacity as a Police Officer for the City of Indianapolis and the Indianapolis Metropolitan Police Department, <br><br> Defendants. | Case No. 1:09-cv-1399-TWP-DML |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This Section 1983 case is before the Court on Defendants' Motion for Summary Judgment. There are many parties in this case. Plaintiffs are Kathy Taylor ("Ms. Taylor), Fred Taylor ("Mr. Taylor"), Margie Dunbar ("Dunbar"), and Chrystal Stetler ("Stetler"), both individually and as guardian ad litem of the minor children K.S., B.S., and E.S. (collectively, "Plaintiffs"). Defendants are Indianapolis Metropolitan Police Department ("IMPD"), the City of Indianapolis ("City"), Police Chief Michael Spears ("Spears"), and Canine Officer Mark Rand ("Rand") (collectively, "Defendants"). Plaintiffs' lawsuit stems from allegations that Defendants committed a slew of constitutional and state law violations while arresting Ms. Taylor. For the reasons set forth below, Defendants' Motion for Summary Judgment (Dkt. 61) is **GRANTED** with respect to Plaintiffs' federal claims. The Court declines to address the merits of Plaintiffs'

state law claims and therefore **DISMISSES** those claims **WITHOUT PREJUDICE** so that Plaintiffs may re-file those claims in state court.

## I. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## II. <u>BACKGROUND</u>

On the afternoon of November 24, 2007, IMPD officers were sent to an Indianapolis home to arrest Ms. Taylor on outstanding warrants from Lafayette, Indiana in connection with a

felony theft/burglary charge and a misdemeanor driving while intoxicated charge.[1] Dispatch informed the officers that shots had been fired "right there in that area" earlier that month. Rand, the canine officer, testified that he typically accompanies officers on any warrant service involving a felony or a violent misdemeanor. When the officers arrived, they set up a perimeter around the home. At this time, the officers observed that someone was looking at them through the blinds and that the person quickly moved away from the window.

The precise timing of events is somewhat unclear. But, apparently soon thereafter, Mr. Taylor exited the residence. He was quickly detained and roughed up by the officers. Specifically, a non-party officer grabbed Mr. Taylor, handcuffed him, threw him to the ground, and pointed a gun at his head and threatened to kill him. About this time, Rand observed a female running from a front bedroom towards the back of the house. Believing the woman could be Ms. Taylor, Rand stepped inside the doorway of the house and stated, "Police Canine. Stop or I'll release the dog." The person, identified as Dunbar (Ms. Taylor's mother), complied, helped remove children from the home, and was detained. Apparently, at some point, an unidentified officer slammed her head against a rail.[2]

Rand asked Dunbar, who was in the "process of moving in" to the house and had already been staying there for approximately one month, for her consent to search the home. The evidence indicates that she consented. On this point, Rand unequivocally testified that Dunbar consented. As for Dunbar, she testified in a somewhat equivocal fashion, but did not contradict Rand's testimony. Specifically, she testified as follows:

---

[1] At the time, Mr. Taylor was also wanted on a warrant from Lafayette, Indiana, but the Lafayette police informed IMPD that they would not extradite him.

[2] Plaintiffs have not sued the officers who inflicted force on Mr. Taylor and Dunbar. Specifically, Defendants identify Officer Vincent Stewart as the man who allegedly pointed a gun at Mr. Taylor; however, Officer Stewart is not a party to this lawsuit.

> Q. Do you remember telling the officers they could search the house?
>
> A. I don't remember that.
>
> Q. Do you think that you might have told them that?
>
> A. I probably might have, yeah.

(Dunbar Depo. 27:9-13).

After receiving what he believed to be consent, Rand entered the house and commanded "Police Canine, come out now or I will search with a dog and you may be bitten," and began searching the home. While searching, Rand repeated this warning one or two more times. A fellow officer, James Burton, confirmed that he heard Rand announce himself and order anybody to come out of the house. Rand's warnings failed to elicit a response from Ms. Taylor. During the search, Rand gave slack to the canine on the line and let him go to the end of the leash. According to Ms. Taylor, she was talking on the phone in the laundry room at the back of the house throughout all of the commotion and did not hear any of Rand's warnings. After a few minutes, the canine led Rand into the laundry room at the back of the house. Rand testified that as he tried to enter the room, Ms. Taylor tried to slam the door shut, hitting Rand with the door. Mrs. Taylor testified that "all I saw was a gentleman with a black sock hat and wearing all black and a dog. I didn't hear my name called. All I heard was 'shut the fuck up and get the fuck down.'" (Dkt. 68 at 5). Further, she heard the officer give a command in what she describes as a "foreign language." At some point around this time, Rand admits that he may have used the word "stellan," the Dutch word for "attack."

The canine engaged Ms. Taylor and bit her in the stomach, then the hand, and then re-engaged her stomach. With respect to her encounter with the canine, Ms. Taylor testified, "And I immediately went 'Whoa' and threw my hands in the air and stepped back, and before I knew

it, I was knocked out of my shoes on the ground and being ripped to shreds in my stomach." (Ms. Taylor Depo. 31:17-20).

Rand testified that, from his vantage point, Ms. Taylor fought back against the canine and tried to dig her fingernails into its snout. During the melee, Rand instructed Ms. Taylor to let go of the canine and, when Ms. Taylor failed to do so, Rand performed two open-handed strikes to the side of her head and allegedly shouted, "Let go of my dog, you fucking whore." Rand then ordered the canine to cease biting. Ms. Taylor was then arrested and taken to Wishard Hospital in Indianapolis. According to medical records, Ms. Taylor suffered puncture wounds to her abdomen and a three centimeter laceration, which was later enlarged during a wound exploration at the hospital. Ms. Taylor also testified that she broke her hand during the incident.

On November 9, 2009, Plaintiffs sued IMPD, Spears, and twenty unnamed officers. On March 5, 2010, Plaintiffs sought leave to file an amended complaint in response to a motion to dismiss. The Court granted leave on August 5, 2010. The Amended Complaint abandoned the claims against the unnamed officers but added claims against the City and Rand. Additional facts are added below as needed.

## III. DISCUSSION

Defendants essentially make a two-pronged argument in favor of summary judgment. First, Defendants argue that they are not proper parties to this lawsuit and, second, even if Defendants are proper parties, Plaintiffs' substantive arguments cannot survive summary judgment. The Court begins its analysis with Plaintiffs' federal claims.[3]

---

[3] Plaintiffs effectively concede that their federal claims against unidentified officers cannot stand alone, stating only that "their violations are relevant to the claims against the defendants relevant to custom or policy to which the defendants have acquiesced." (Dkt. 68 at 19). In other words, Plaintiffs argue that these allegations are relevant to their *Monell* claims. For the reasons set forth below, however, Plaintiffs' *Monell* claims cannot survive summary judgment.

5

A. Federal Claims

Section 1983 is not a source of substantive rights. Instead, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n. 9 (1999) (citation and internal quotations omitted). To prevail on § 1983 claim, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. Exrel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citation omitted).

1. IMPD

As an initial matter, IMPD is not a separate, suable entity. *See, e.g., Perry v. Thomas*, 2011 WL 693622, at *4 (S.D. Ind. Feb. 18, 2011) ("The IMPD is not a suable entity and thus not a proper party in this action.") (citations omitted); *Hayes v. City of Indianapolis*, 2009 WL 700232, at *1 n.1 ("The IMPD is not a suable entity under 42 U.S.C. § 1983 and the claim against it is actually against the City . . . "). Thus, summary judgment is **GRANTED** on all claims against the IMPD.

2. Spears, in his individual capacity

Plaintiffs have sued Spears, the Chief of Police, in his individual capacity. It is well-settled that § 1983 lawsuits require that the defendant have personal involvement in the alleged constitutional violation. *Palmer v. Marion County*, 327 F.3d 588, 593-94 (7th Cir. 2003) ("Palmer has made no showing that Sheriff Cottey was personally involved in the decision making allegedly amounting to [a] violation of Palmer's constitutional rights; thus, we can dispose of Palmer's claims against Sheriff Cottey in his individual capacity in short order.").

Similarly, here, no credible evidence suggests that Spears had any personal involvement with the incident in question.

Rather, a fair reading of the Amended Complaint indicates that Plaintiffs are pursuing a "supervisory liability" theory against Spears. Specifically, Plaintiffs allege that Spears is involved in officer training and that myriad violations occurred on the day of the incident. From there, Plaintiffs posit that "[t]his widespread failure to follow proper procedure is indicative of failed training procedures." (Dkt. 68 at 10). This argument misses the mark. Section 1983 does not establish a system of vicarious liability, *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1976), and absent vicarious liability, "each Government official . . . is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (rejecting argument that supervisor can be held personally liable under § 1983 for knowledge and acquiescence to a subordinate's unconstitutional conduct); *see also Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise.").

Thus, any personal liability claim based on a failure to train would require Spears to "to personally display[] deliberate indifference to the risk" created by inadequate training. *Whitson v. Stone County Jail*, 602 F.3d 920, 928 (8th Cir. 2010). Similarly, the Seventh Circuit has recognized that "there must at least be a showing that the [defendant] acquiesced in some demonstrable way in the alleged constitutional deprivation." *Palmer*, 327 F.3d at 594. Plaintiffs simply have no evidence to support the notion that Spears behaved with such cavalier indifference. In effect, Plaintiffs have invited the Court to take a speculative leap. The Court, of course, cannot do so. *See, e.g., Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49-50 (1st Cir. 2009) ("The deliberate indifference required to establish a supervisory liability/failure to train claim

cannot plausibly be inferred from the mere existence of a poorly-implemented strip search or x-ray policy and a bald assertion that the surgery somehow resulted from those policies."). Thus, summary judgment is **GRANTED** with respect to all claims against Spears in his individual capacity.

### 3. Monell claims against Spears in his official capacity and the City

As an initial matter, Plaintiffs' Monell claims against the City and Spears in his official capacity are treated as one and the same. *See Grievson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) ("Grievson's claims against the Sheriff in his official capacity are treated as claims against Marion County itself."). Plaintiffs premise their Monell claims on the theory that the City (and Spears in his official capacity) has allowed the unconstitutional practice of using excessive force to become pervasive.[4] To bolster this claim, Plaintiffs rely on two facts: (1) the City has been sued numerous times in the past for excessive force, and (2) Spears and his department have been the subject of considerable public scrutiny.

As mentioned above, "municipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." Palmer, 327 F.3d at 594. Rather, case law recognizes three ways in which a municipality's policy can violate an individual's civil rights:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (citation and internal quotations omitted). Further, to be liable, a government entity's official policy or custom must be the "moving force behind" the alleged constitutional deprivation. *Grieveson*, 538 F.3d at 771.

---

[4] Plaintiffs' response effectively abandons all *Monell* claims, except for the one arising out of allegations of excessive force. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not presented to district court in response to summary judgment motions are waived).

Plaintiffs' evidence of prior lawsuits does not show the requisite "custom or usage" of excessive force and, once again, only invites the Court to speculate. For that matter, Plaintiffs do not attempt to show that any of the prior lawsuits or complaints are factually similar to the present circumstances. Courts have routinely held that a handful of complaints and filed lawsuits, without more, does not equate to a showing of a well-settled and widespread practice. *See, e.g., Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (no municipal liability where plaintiff could not show that any other complaints of excessive force involved factual situations that were substantially similar to the plaintiff's incident); *Lockhart v. Village of Riverdale*, 2003 WL 21212589, at *4 (N.D. Ill. May 22, 2003) ("The fact that complaints were made is not enough, standing alone, to establish liability…under a custom and practice theory of liability."); *Shales v. General Chauffeurs, Salesdrivers and Helpers Local Union No. 330*, 2007 WL 1296987, at *5 (N.D. Ill. May 2, 2007) ("Shales' evidence that a few lawsuits (whose factual circumstances and ultimate dispositions Shales does not provide) were filed over an unknown span of time does not establish a widespread practice…that is so permanent and well-settled as to constitute a custom or usage with the force of law."); *Wakefield v. City of Pembroke Pines*, 269 Fed. Appx. 936, 940 n.3 (11th Cir. 2008) ("the mere fact that nine complaints were made against Officer Barber over the course of nineteen years is not sufficient to establish 'a persistent and widespread practice' of the City."). The Court finds no reason to depart from this sound line of reasoning. Accordingly, summary judgment on Plaintiffs' *Monell* claims is **GRANTED**. Given the nature of the Court's ruling, it need not address the issue of whether the City is a proper party to this action.

### 4. Rand

Defendants argue that the Court need not address Rand's qualified immunity defense because he was not added to the Amended Complaint until after the two-year statute of limitations had run. *See* Ind. Code § 34-11-2-4 (two-year statute of limitations for injury to person); *Bailey v. Faulkner*, 765 F.2d 102, 103 (7th Cir. 1985) (two year statute of limitations applies to Section 1983 claim commenced in Indiana). Indeed, the Court has serious doubts as to whether Plaintiffs' claims against Rand can survive a statute of limitations argument. Here, the event in question occurred on November 24, 2007, and Plaintiffs filed their initial Complaint on November 9, 2009, but did not name Rand as a party. Instead, the Complaint named twenty unidentified police officers. For reasons that remain somewhat perplexing to the Court, Rand was not added as a party until 2010, after the operative statute of limitations had run. Plaintiffs contend that the statute of limitations does not bar their claims against Rand because the amendment "relates back" under Fed. R. Civ. P. 15(C).

As an initial matter, Plaintiffs' attempt to use unidentified officers as placeholders fails. *See Watch v. Dave*, 128 F.3d 1057, 1060 (7th Cir. 1997) ("it is pointless to include lists of anonymous defendants in federal court…"). Next, as the Seventh Circuit recently clarified, courts must make two inquiries to determine if an amendment "relates back" under Rule 15© for purposes of the statute of limitations. First, "whether the defendant who is sought to be added by the amendment knew or should have known that the plaintiff, had it not been for a mistake, would have sued him instead or in addition to suing the named defendant." *Joseph v. Elan Motorsports Technologies Racing Corp.*, 638 F.3d 555 (7th Cir. 2011). Second, "whether, even if so, the delay in the plaintiff's discovering his mistake impaired the new defendant's ability to defend himself." *Id.* The first question, in particular, generates numerous concerns for the Court

because Rand is clearly identified as the canine officer in the police reports concerning this incident. Nonetheless, the Court declines to address this more technical issue head-on; even if Rand is deemed a proper party, he is entitled to qualified immunity.

The applicability of qualified immunity is determined by a two-part inquiry established in *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court "must consider…this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, the Court must decide whether the right at issue was "clearly established" at the time of the officer's alleged misconduct. *Id.* The answer to both *Saucier* questions must be in the affirmative in order for plaintiff to defeat an officer's motion for summary judgment on qualified immunity grounds. *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002).

*Saucier* set out rigid obligations for district courts, mandating a two-step sequence in which the first inquiry had to be answered before the second inquiry could be assessed. *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009). This rigidity caused a backlash; some courts voiced criticism of the rule, while others eschewed it altogether. *Id.* at 817-18. Based on this concern, the Supreme Court revisited and loosened *Saucier* procedure through *Pearson*, deciding that it "should not be regarded as an inflexible requirement." *Id.* at 813. Thus, the Court need not resolve the two inquiries in a sequential fashion, and is free to address the second inquiry before the first. *Id.* at 818 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Here, the Court finds the second inquiry dispositive. Specifically, this inquiry – whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct – "must be undertaken in light of the specific context of the case, not as a broad general proposition…". *Saucier*, 533 U.S. at 201. For the right to be *clearly established*, "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Thus, as long as "officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Wagner v. Washington County*, 493 F.3d 833, 837 (7th Cir. 2007) (citations and internal quotations omitted). Under Seventh Circuit precedent, a violation is "clearly established" where: (1) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution; or (2) a closely analogous case establishes that the conduct is unconstitutional. *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (citation omitted). Finally, Plaintiffs bear the burden of demonstrating the violation of a clearly established right. *Forman v. Richmond Police Dept.*, 104 F.3d 950, 957-58 (7th Cir.1997).

Plaintiffs do not try to identify closely analogous case law to show a violation of a "clearly established" right. Instead, they rely exclusively on expert testimony that proper policy was not followed, the decision to search the home was "rushed," the use of the canine was unnecessary and excessive, and another course of action was preferable.[5] Even if the expert is correct, however, this testimony does not establish that the violation was so obvious that Rand knew his actions violated the Constitution. Here, Rand (1) entered a home in a neighborhood where shots had been fired earlier that month "right…in that area" to apprehend a suspect wanted on felony and misdemeanor charges; (2) presumably believed that Ms. Taylor was hiding

---

[5] Defendants ask the Court to strike Plaintiffs' expert evidence because it was not timely disclosed in accordance with the parties' Case Management Plan. Given the Court's ruling, it need not address this issue.

in the home, given that she had not yet made her presence known; (3) entered the home and repeatedly warned any remaining occupants that he was accompanied by a canine that might bite[6]; (4) sought to enter the laundry room with the canine and issued an order for the canine to engage and, after the canine engaged, struck Ms. Taylor in the head because he perceived that she was fighting the dog; and (5) ordered the dog to cease. Given Rand's limited point of view and the split-second nature of this tense encounter, the Court cannot find Rand's actions to be an obvious Constitutional violation.

On this point, *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) is a somewhat useful guidepost, even though it involved a suspect accused of a more serious crime who was fleeing on foot. In *Johnson*, an officer and his dog were chasing a suspect accused of a shooting on foot. *Id*. at 659. The suspect encountered a fence, turned around, put his hands in the air, and said, "I give up." *Id*. The dog then bit the suspect's arm and the officer knocked him to the ground. *Id*. The suspect struggled to release himself from the dog's bite, which the officer interpreted as resistance, so the officer struck him several times to subdue him. *Id*. The dog then moved to bite the suspect's leg, at which point the officer was able to handcuff the suspect and order the dog away. *Id*.

The Seventh Circuit affirmed the grant of summary judgment for the officer and recognized that "[the officer's] use of force – in the form of [the dog] – to subdue [the suspect] was objectively reasonable, given the uncertainties in the situation that faced him." *Id*. at 660-61; *see also Brady v. Scott*, 2010 WL 3946527, at *3, 6 (N.D. Ind. Oct. 5, 2010) (officer entitled to qualified immunity after releasing dog on individual who exited car after leading police on a chase and who was involved in a drug transaction; "it was not unreasonable for [the officer] to

---

[6] Ms. Taylor did not hear Rand's warnings. But this does not contradict the evidence establishing that Rand actually voiced warnings.

conclude that using a police dog to help him subdue [the suspect] was permissible . . .".); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150-51 (1st Cir. 2003) (officer's use of dog to bite and hold suspect was not excessive even though officer knew that suspect had only committed minor traffic infractions, as suspect was attempting to evade arrest by fleeing when the officer released canine); *Rabbinate v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988) (fatal attack on burglary suspect by police dog was objectively reasonable because of undisputed testimony that police shouted warnings before releasing dog when suspect was hiding in darkened building in middle of night); *Davis v. Rena*, 2007 WL 3348413, at *4 (C.D. Ill. Nov. 9, 2007) (officer entitled to qualified immunity where canines were released when plaintiff failed to open vehicle door and exit pursuant to officer's orders). Moreover, the present circumstances are easily distinguishable from those found in a case like *Vathekan v. Prince George's County*, 154 F.3d 173, 176 (4th Cir. 1998) (no qualified immunity where officer failed to give warning before releasing canine into an occupied room with instructions to bite anyone it encounters, and canine bit plaintiff while she was asleep).

Thus, even if in retrospect Rand used more force than necessary to effectuate Ms. Thomas' arrest, (and the facts of this case are very disturbing), the Court must still find that he is entitled to qualified immunity. Indeed, officers are not gifted with 20/20 vision of hindsight, meaning the appropriate level of force should be judged from the "on-scene perspective." *Saucier*, 533 U.S. at 205; *Graham v. Connor*, 490 U.S 386, 396 (1989). Given the context, where Rand was uncertain of how Ms. Taylor would react when cornered, Rand's conduct was not "so egregious that no reasonable personal could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001); *see also Saucier*, 533 U.S. at 206 ("Qualified immunity operates…to protect officers from the sometimes

hazy border between excessive and acceptable force…and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.") (citations and internal quotations omitted); *Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) ("the doctrine of qualified immunity leaves ample room for mistaken judgments by police officers") (citations and internal quotations omitted). Accordingly, summary judgment is **GRANTED** with respect to Plaintiffs' claims relating to Rand's conduct.[7]

**B.     State law claims**

Defendants also move for summary judgment on Plaintiffs' remaining state law claims. The Court's jurisdiction on all of the Plaintiffs' remaining claims is based upon 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based upon state law that are closely related to the federal claim(s) in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." Leister v. Dovetail, Inc., 546 F.3d 875, 882 (7th Cir. 2008). Moreover, there are no statute of limitations concerns, given that 28 U.S.C. § 1367(d) grants the plaintiff an additional 30 days to re-file dismissed supplemental claims in state court. *See Hopkins v. White*, 292 Fed. Appx. 497, 500 (7th Cir. 2008). Accordingly, the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims and hereby **DISMISSES** those claims **WITHOUT PREJUDICE** so that Plaintiffs may file in state court.

---

[7] To the extent Plaintiffs pursue a claim against Rand for an unlawful search, that claim cannot survive summary judgment. The evidence shows that Rand was affecting an arrest warrant and that Dunbar, an inhabitant of the house at the time, consented to the search. *See, e.g., United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004) (consent may be obtained "either from the person whose property is searched… or from someone, such as a spouse, with *actual or apparent authority* over the premises…") (emphasis added). At the very least, Dunbar had apparent authority.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment (Dkt. 61) is **GRANTED IN PART** and Plaintiffs' remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.

SO ORDERED:

Date: 06/30/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jennifer Lynn Haley
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
jhaley@indy.gov, bdoyle@indy.gov

Justin F. Roebel
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jroebel@indygov.org, mohaver@indygov.org

Ned J. Tonner
NED J. TONNER, ATTORNEY AT LAW
ned@tonnerlaw.com, shawn@tonnerlaw.com